Good morning. My name is Rob DeCantori, with me is Michael Weiner, and we represent the plaintiff's appellants in this case. Could you help me with the difficulty I'm having with your argument? Sure, your honor. In my town, they don't make a lot of movies, but there are a lot of mom-and-pop construction companies, and a lot of them aren't too good at doing their paperwork, so they hire local bookkeeping companies to do their paperwork, which includes the checks to their employees. My firm does the same thing. All that kind of stuff. My firm does the same thing. Why is that any different from this movie producer hiring this outfit EMS to do its paperwork on the hires? The major difference, your honor, is that when my firm, and I suppose your local construction company does that, they hire a company like Paychex, which is the company my firm hires. Paychex prepares the checks, prepares the W-2 forms, prepares the reports to the IRS, but when the checks are prepared, I, as president, sign the checks to my law corporation. The checks are drawn on my law corporation's account. The name on the pay stub is Gilbert and Sackman, the name of my firm. Not Paychex. And the money comes out of Gilbert and Sackman's operating funds, not Paychex funds. Why does that make a difference? The major difference, your honor, is California law, which says that when issuing a paycheck, and this is section 226 of the labor code, the paycheck shall contain certain information, hourly rates, piece worker rates, things like that, but the key language in it is every employer has to comply with section 266, and it must contain an accurate itemized statement in writing showing, number eight, the name and address of the legal entity that is the employer. The obvious intent of this statute is to allow employees to check their paychecks, make sure they're accurate, and to know to whom they can turn if there is a problem. In this case, the only name on those wage statements was the respondent in this appeal. How is this case any different from Futrell v. Payday California? Which you do not cite in your brief. Which came down after the briefs were filed, your honor. Well, you could tell us about it anyway, couldn't you? Okay. That represents California law. No, that represents the California Court of Appeals. Opinion of what California law is, your job, however, your honor, is to decide what the California Supreme Court would do. Okay, and our case law says very clearly that unless we are thoroughly convinced that the Supreme Court of a state would refuse to follow a published court of appeals decision, then we follow the court of appeals decision. So you have to convince us that the California Supreme Court would flatly reject the analysis in Futrell. Yes, your honor. Futrell is wrong on a few points, your honor. First, they admit they were writing from a clean slate, so they really had no published decisions to follow. So what? You still have to convince us that the Supreme Court wouldn't follow it. They held that control over wages means that a person or entity has the power or authority to negotiate and set the employee's rate of pay. That, your honor, is enough probably to fit the common law test, which is one of several different tests that Martinez, which we also didn't cite in our brief because it came down, and it is a California Supreme Court decision, that's probably enough to nail them under the common law test. Well, you were lucky your opposing counsel didn't supplement his brief. But you still had to get around it. I am still trying to get there, your honor. Under the payday case, Futrell, I want to follow Judge Kleinfeld's view. So we've got this Alaska contractor or a Colorado contractor, and they don't do their own payroll. They hire it out. You're saying that there should be a distinction between the case where the checks come back, as in your situation, for signature by the employer, and the cases in which the payroll company is merely reimbursed for the service, including the payouts? Yes, your honor. Why? Because the payroll company is actually a misnomer. I mean, we're talking basically about what, and they have their own association now, professional employer organization. I did a little bit of software tell in my preparation for argument. I went on Wikipedia, and they define that as a single source provider of integrated services, which enable business owners to cost-effectively outsource the management of human resources. They have outsourced the human resources part of their business. Which is even more than this case, right? No, this is what this case is. This company made contributions to the union trust fund, paid employees even when it had terminated the contract with the entity it claims is the only employer in this case. After the termination of that contract, it paid employees out of its own assets. Now, those assets were later reimbursed by a third company. I mean, that's how Hollywood works. Counselor is right in his brief. These employees go to the work site. They don't know who the employer is. But they are given... When you say paid out of their own assets, you mean advanced credit. They advanced the wages for the employees. But they weren't just doing it on their own. They expected to get reimbursed, and they weren't, right?  Here's what happens, Your Honor. Generally speaking, the production company, some production company, sends these professional employment organizations $20,000 for the week's pay. The professional employee organization then writes the checks, deposits the $20,000 into its bank account, and issues $20,000 worth of checks. So maybe $18,000 checks, and puts $2,000 in its pocket as a profit. This company, without having received any $20,000, still issued $18,000 worth of checks. At a time, at a time, when it had canceled its contract with the company which had been advancing the $20,000 checks. None of this was in the Frutrell case. Frutrell, I don't even think, had oral argument or written briefs on the issue. Frutrell came down right after Martinez, and I don't think had the benefit of briefing on the issue. Once again, they controlled the wages, which is one of the tests in Martinez. They also permitted the employees to work. In Martinez. Let me back up to that statement you just made. They controlled the wages. These things usually come up in the context of employee or independent contractor. Control the wages means decide how much to pay somebody. If I understand the facts right, and I want you to educate me, if I don't, it's quite possible I don't. This EMS doesn't control how much somebody should get paid, what his hourly rate is, what his total pay should be, whether he's hired, fired, when he's supposed to come to work, when he should go home, any of that. They just take the numbers that the production company gives them. Is that true? That is true, Your Honor, with a few minor exceptions that I don't think are relevant. Well, the contract specified that EMS would not control either directly or indirectly the wages, hours, or working conditions, correct? That's what the contract said, but you control the working conditions when you receive the RANS forms, the I-9 forms, and decide whether or not that employee has complied with federal. That's not what working conditions usually means. That means things like restroom breaks and whether you get health benefits or you don't. They control that. They made the contributions to the EMS. Well, they don't decide whether there would be such benefits. They paid them. That's different. They had the power not to issue the paychecks. They also permitted the employees to work. I'd like to do a flip on this and kind of look at this from your perspective. What you would have us say is, in the Ninth Circuit, an integrated payroll system basically creates a dual employer situation, that you have two employers. Yes, Your Honor. That's what you want us to hold. When it takes over the whole human resources function of a company, identifies itself as the employer to the employees, under 226 of the Labor Code, under pay stubs, to the federal government, the IRS, to the INS, to everybody else as the employer. I didn't identify them as the employer. They did. To say that they're not the employer for purposes of wages, I think, is somewhat counterintuitive, just because they don't control the day-to-day aspects of employment. I thought they couldn't control anything. I thought the production company signed the collective bargaining agreement, and even if EMS thought somebody should get paid more than they get, somebody should get paid less than they get, they wouldn't have a thing to say about it. The only thing they had to say is, how do you compute overtime? How do you compute the weekly wages? They admit that there were mistakes made in those computations. My little calculator used to say that, and I used to do what it said, but it didn't have any independent authority in my law office. It had the ability, Your Honor, one thing that was lacking in the Martinez case, where the Supreme Court said, what could these people do other than cease buying fruit and vegetables? They had the ability to know that there was no money there to meet payroll, and to at least inform the employees of that fact. They permitted the employees to continue working after the money dried up. They actually paid one week's pay with their own pay, with their own assets, as opposed to money that had been transferred from the production company, and then continued to allow the employees, permitted the employees to continue working after that. So you're not pursuing that under a breach of the collective bargaining agreement theory? Well, that's also up there, Your Honor, too. We contend that up here. Well, you didn't argue that below. Up there, you mean up here? Well, you didn't argue that down there. What I said to the judge was, if I'm going to have to appeal, I might as well do it all at once, Your Honor. Well, actually, that aspect of the case is troubling to me, because the district court recognized that the sole issue presented by the motion for summary judgment was under California law solely. And it says the sole issue is whether EMS was an employer under California law. And then it's a little unclear what happens to the federal claim, but I don't understand how the federal claim can get swept up in this holding, because the court ended up saying that it's strictly a matter of state law, and, of course, the federal law is not the same as the state law necessarily. And obviously the other side says you waived any opportunity to argue about that legal issue, even though it had been litigated throughout the proceedings below. What is your response to that? My statement was my statement, and that's in the record, Your Honor. I don't think that constitutes a waiver of the issue, just my desire to get up to you three judges rather quickly rather than slowly. But, again, Your Honor. The only way to do that was by waiving. I don't think that was a waiver, Your Honor. I mean, you could have told the judge, wait a minute, this isn't the whole case. We still have some federal claims we want to litigate here. Yes, Your Honor. I could have. I didn't. But I don't think that constitutes a waiver. Once again, Your Honor, I think that the controlling authority is not Futrell. It's Martinez. And I do think that in light of Martinez, I think Futrell got it wrong for two reasons. It misapplied what control over wages means, confusing that with the common law test, and also confusing what it means to suffer or permit to work. This is not like a grower in Martinez where the court said, well, the only thing the court, the person you're alleging are employers could do is stop buying vegetables from them. They have no other power. This is more like the child laborer where the mechanic brings the child in and the child is working for the mechanic, not the ultimate employer, and the employer says, well, I'm not controlling the child, my mechanic is. They knew enough to have stopped the work or at least advised the employees that they weren't going to get paid, thereby they suffered and permitted them to work. For those two reasons, I think you should look again at Martinez and decide whether or not Futrell got it right. Thank you, counsel. Thank you. Thank you, Your Honor. First, I want to talk about Martinez and whether we even get to Martinez because the California Supreme Court was addressing specifically a minimum wage and overtime violation, specifically a minimum wage violation in that case. 1194, which invokes the wage order, is not in this case. This is a breach of contract for unpaid wages. These guys all receive minimum wage. They're exempt from overtime. That's why none of these things were raised at the trial court. So I don't think we get to Martinez and its progeny, which is Futrell. If we do, Futrell is dispositive. The appellate court properly defined wages as the ability to control, and even if you didn't find that definition persuasive, we do need to turn back to where this language controls wages. I have some issues with this integrated payroll service where it goes beyond mere payment and goes into other attributes, which are traditional employer attributes. The kinds of things that you're doing here is going beyond mere payment and going into, is this a legal resident? That's clearly the obligation of an employer and not the obligation of some payroll service. And if you do establish a dual employer situation, that presents other aspects. Did you ever consider asking for certification to the Supreme Court of this question? No, Your Honor, we did not.  Well, I'll address that issue. It's just a creation of these production companies going out of business. Now, the law requires that you keep these INS forms for three years, and then there's criminal liability for the people that fail to do that. So the production company, they don't want to have a bunch of these boxes of INS forms. They get destroyed. INS comes in and says, well, you guys are all under arrest. So they outsource that just to store this stuff and keep it in compliance. So I don't think we want to say that companies that are helping production companies comply with the law for INS are suddenly on the hook for tens of thousands of dollars in wages. Well, the question isn't, it isn't the, let me backtrack. I can understand that there are unique reasons in the movie industry why there is outsourcing of more than what would be outsourced for the typical law firm or mom-and-pop grocery store or whatever. But whatever the reasons for it, and they're obviously good reasons because the production companies come and go and the movies come and go, the question remains when that grant of authority is made, what's the result of it, which is separate from whether it's a good idea. Well, I think the grant of authority was contained in the contract, which you correctly noted. It said we can't control any of this. This is the only thing we can do. We are slaves to the production company. They give us a time card. We run it through a calculator and return it back. The most troubling aspect to me is who signs the paycheck, which is peculiar. And I don't know what effect that has. But if you could talk about that, I'd appreciate it. Well, ultimately, who signs the paycheck is not who the employer is. Otherwise, individuals and the president of the company, whoever is going to sign somebody's paycheck, that doesn't instantly make them the employer. No, but they sign on behalf of their entity, and that's the issue here. It's signed on behalf of a different entity than the production company. Yeah. This is also, again, a creation of various state laws. So California state law, which it was an issue in this case, but it does have a statute that requires that the check be drawn on a California bank. Well, these are Indian companies. The owners were in India, and Mr. Cantore said he had trouble paying them. And these production companies shoot in a variety of different states. So in this particular case, it's going to be drawn on a California bank from this California company that's authorized to do business in the state it's shooting in. So, again, it's just in the context of the various wage and hour claims across the country, the way these things operate is that the payroll company makes sure this stuff is complied with. I do just want to make the analogy in terms of where the funds come from. Let's say I have my law firm, and I'm issuing my paychecks to my employees, but I don't have the cash because I haven't won enough lawsuits this month. So I draw on a line of credit, and the bank loans me the money. In fact, I don't even call the bank first. I have an agreement with my bank that they'll automatically advance checks drawn against my line of credit. And I issue my checks against the line of credit. The bank is the one that's actually loaning the money. The bank is the one paying those people. Can my employees now suddenly go Sue Wells Fargo in order to get their wages back? So we have an intricate economy. People lend other people money to pay other people to do certain services for them. What we have to look at is who's in control of these wages, and who does it benefit? This is clearly an outsourced arrangement. We don't get a cut of the movie. We don't get our name in the credits. We don't get any of this stuff. All we get is a little processing fee for processing payroll. They keep saying we're not a payroll company. Well, we bill like a payroll company. We act like a payroll company. We perform all the functions of a payroll company. We don't do HR. We don't hire. We don't fire. We don't do any of these things. I do just want to address the one thing I was going to talk about from the Industrial Welfare Commission's wage order, which defines the language of the control of wages. Later in that same regulation, there's a section that talks about why these people are exempt, and that's 3J. And it says, except as provided in subsection E&I, which deals with one day's rest and seven, this section shall not apply to any employee covered by a valid collective bargaining agreement if the agreement expressly provides for the wages, hours of work, and working conditions of the employees. So when the IWC uses the words working conditions, it means things that are typically found in collective bargaining agreements, like can you work at night? Do you work on Sunday? Do you get triple time if you work on Martin Luther King Day? All these things are traditionally put into collective bargaining agreements, and that is exactly what the IWC meant when they said wages. They meant wages that are typically negotiated inside a collective bargaining agreement. Hey, if you're a driver, you get $28 an hour. That's a wage. How far can the integrated payroll company go before they step into the shoes of the employer? Is there a scenario that you can see where you – under which you would lose? Yes, Your Honor. I believe if the company took a cut of the picture, if they suddenly had an interest – and this is where – because Martina and Futrell – Martina's v. Combs is an interesting case because it's trying to distinguish this Reynolds v. Bennett. And Reynolds v. Bennett said individual agents or corporate agents are not liable. And Martina's v. Combs didn't find liability, but says there could be liability in certain cases, but the California Supreme Court hasn't told us what those cases would be. And that is, I think, what the heart of your question is. And here's where I think the line is. The individual agents in Reynolds v. Bennett were not liable because – and the Supreme Court said they weren't – these people weren't working for them. There was no evidence that somebody had performed personal services for the executive of the company or that the executives of the company had absconded with wages or the work product of these employees. That is, they weren't working for the executive. The executive was an agent of this other company. Now, that's the key distinction in terms of this – and the wage order even says you can use other agents and people acting on your behalf. It doesn't say these other agents and people acting on your behalf are going to be employers. It just says that that will still be the employer. So the key distinction is as soon as it's for your benefit, as soon as – and this gets into the other definitions of when you suffer and permit people to work, and a lot of it overlaps with independent contractor and volunteer stuff, but it's a fairly straightforward analysis. If the payroll company – at the point in which this panel declared that at the point where the integrated service goes to the degree of paying out of their own account, on their own bank account, on their own funds, advancing funds, that line has been crossed at that point, that you cannot cross that line and still remain immune from suit. Well, I don't think that's a meaningful distinction because the contract requires that the company pay them back. Now, if it was – What if the practice in the industry was that sometimes they did and sometimes they didn't pay them back? Well, that is the practice in the industry. Which is this case, right? In this case. Here, EMS had been fully compensated. The counterclaim was that if – or the cross-complaint was if EMS is required to pay wages in this lawsuit, then we want to get that money back from Happy Hours and the other production companies. Right. So, they were paid here. I don't know if it's in the contract here, but I'm pretty sure that this contract is a check exchange type of contract. That is where the company hands a $100,000 check and EMS hands them $100,000 in payroll. That's a very common industry practice. I believe that was in Paul Shuman's declaration. Obviously, though, there would be some advancing of the funds. That issue was in Fruit Trail. Fruit Trail says that's not enough to turn it into an employment relationship. Where the line is, I think, is when you become a participant in the enterprise. If you say, I realize you're short on the funds, we're going to advance this, and if you guys win an Oscar, you make a million dollars, then we're going to get paid at the end. If they're somehow putting up the money without a contractually pre-negotiated – You don't think that the common law test of employer is right either. You also want us to reject that, not just the claimants. No, Your Honor. I started – Without having any control over who's hired, who's fired, when they come to work, what they do in their work, that sort of thing. Well, there's two separate things there. For example, somebody might get 10% of everything over some number that will never be reached for telling their story and allowing use of their story. That could be. If that person is also computing payroll and doing tax forms and other things, that might be a closer case than this one. I don't think that would – I do believe it is. I assume you were advocating the common law test. Your Honor, I absolutely believe that the common law is the correct test. The district court got it right. We only get into these conversations about IWC wage orders and Martinez v. Combs and Futrell if we reject the common law and say we need this 1194 claim. Let me ask you about something else you said that I realized I didn't know this. I missed it. You talked about check exchange. Are you saying that what happens is some messenger from the production company goes over to the payroll company and exchanges the production company's check for the payroll company's check so that the production company gives the paychecks to the employees instead of the payroll company distributing checks to the employees? Yes, Your Honor. The production company always distributes the paychecks to the employees. It does. They are couriered to the production company. The production company gives that to the managers. The managers gives that to the employees. Before your time is up, I want to ask you about the federal claim. Under Ninth Circuit law, we do have the discretion to reach any issue that is purely an issue of law that either was litigated fully or doesn't really require factual development. And I'm wondering why we shouldn't use that discretion to decide the one federal claim issue. Basically, the district court said, I'm looking at state law only. And under the definition of state law, you're not an employer. That's fine. But it has absolutely nothing to do, as far as I can tell, with the federal claim. The federal claim just got sort of swept in there. Why shouldn't we carve that back out? Because the legal issue that the district court decided, assuming it was correctly decided, doesn't control the federal claim. Well, first of all, the federal claim is incorporating a breach of California breach of contract claim. So it's a federal claim because it's a contract between a union and a labor organization that meet the requirements of a federal act. But whether that contract was adopted, whether that contract is enforceable, is an issue of California law. Now, that was factually not developed at all at the trial court because issues of adoption, you know, did somebody say I'm adopting the contract? Did they perform under the contract? Well, the reason was you asked for summary judgment on the state law issue, correct? No, Your Honor, the court granted me. It was sua sponte. That's where I'm getting so confused about this because this was all sua sponte. So we have to think about what the district court had in mind about that. But, Your Honor, I will point out that I raised this exact issue to the district court's attention. Oh, I'm well aware of that, and the other counsel said what he said. And it would be manifestly unfair to my client to litigate an issue at the district court, come up here and litigate an issue at the Ninth Circuit, and only to be told, you know, yeah, the other side. Is there any criteria under the contract? Excuse me. That's right. Is there any criteria under the contract under which the company, the payroll company, can decide when to advance and when not to advance funds? Here they have a week of unpaid wages that theoretically could have been advanced, and then the money claimed back is against the production company. Yes, Your Honor, there is. I believe it's three days, or it's a brief period of time. I believe it's three days or seven days. With the maximum amount of money the payroll company can advance? There is no maximum amount. That's what I'm saying. What criteria is there for determining when it draws the line and says, okay, we're not going to advance anymore? I don't believe that's contractually specified, other than that they would have to, you know, pay their previous one promptly, and generally the wages are, you know, one week is substantially similar to the week prior. Thank you, counsel. And since your opposing counsel went a minute over, you're welcome to have a minute for rebuttal. Your Honor, every distinction that Mr. Tracy laid out is a distinction without a difference. They could have just stored INS forms, not actually filled them out as the employer. They could have set up, the Indian company could have set up a checking account in California. I don't think California discriminates against Indian companies, Your Honor. And they did make a profit. Their business model is to make a profit off of the employment of these workers in the motion picture industry. They are a professional employer organization. You thought they made their profit off production companies that didn't want to do their own payroll? Yes, Your Honor. So even if the producer made the movie at a loss, the payroll company could still make a profit? Off of the employment of the workers. Or vice versa. The producer could make a whole lot of money. And if the payroll company was charging too little below its overhead, it could make a loss. Yes, Your Honor. But they still profited because employees were employed. If the production company employed no employees. If we profit from crime, there would be fewer circuit judges. It's a little indirect. Can I get a percentage of the crimes that are committed, Your Honor? But counsel talks about it being unfair to his client. His client, who is it more unfair to? Is it unfair to the company that profits from employment, indirectly perhaps, who has knowledge of the fact that the money isn't fair, who puts its name on the paycheck, tells the employee that it's its employer, and now wants to collect attorney's fees from those same employees when they sued him. I think that's unfair, Your Honor. Thank you, counsel. Thank you. We appreciate very much the arguments of both counsel in this interesting case. It is submitted. And our last case on the argument docket is Rezik v. Holder.
judges: Kleinfeld, Lucero, Graber